UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KAYLA SEILHAM, *et al.* | CIVIL ACTION |
| VERSUS | NO. 17-5176 |
| COMMONWEALTH LAND TITLE INSURANCE COMPANY | SECTION: M (3) |

### ORDER & REASONS

Before the Court is (1) a motion for summary judgment filed by defendant Commonwealth Land Title Insurance Company ("Commonwealth"),[1] to which plaintiffs Kayla Seilham and Baynum P. Aikman (collectively "the Aikmans") respond in opposition,[2] and in further support of which Commonwealth replies;[3] (2) the Aikmans' motion for summary judgment,[4] to which Commonwealth responds in opposition;[5] and (3) Commonwealth's motion to exclude testimony from Ashton W. Ray and Julian J. Rodrigue, Jr.,[6] to which the Aikmans respond in opposition,[7] and in further support of which Commonwealth replies.[8] Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

I.  **BACKGROUND**

This action involves the Aikmans' claims for breach of contract and negligence against their title insurer, Commonwealth, stemming from a civil action in state court in which the Aikmans' neighbors sued them for recognition of, and interference with, a servitude. The

---

[1] R. Doc. 23.
[2] R. Doc. 27.
[3] R. Doc. 50.
[4] R. Doc. 36.
[5] R. Doc. 47.
[6] R. Doc. 38.
[7] R. Doc. 42.
[8] R. Doc. 52.

pertinent facts concerning the land at issue in that case and here have been recited by the Louisiana court of appeal for the first circuit as follows:

> This litigation involves several parcels of contiguous property located in Tangipahoa Parish, more particularly depicted in the appendix hereto.[1] Plaintiffs Jerelean Arnold Naramore, Tammie Naramore Steib, and Craig Steib collectively own the 9.46-acre parcel identified on the appendix by Naramore's name.[2] The adjacent 9.52-acre parcel to the east is owned by plaintiffs Carol Arnold Martinson and David Henry Martinson. Defendants Baynum and Kayla Aikman own a 1.767 [acre] parcel adjacent to the southwest side of the Naramore parcel. An asphalt road, West Sam Arnold Loop, is adjacent to the west side of the Aikman parcel. A gravel road extends from West Sam Arnold Loop through the southern boundary of the Aikman and Naramore parcels. The gravel road is located within an alleged servitude shown on the Bodin survey as the long rectangular area along the southern boundaries of the Aikman and Naramore parcels, and extending across the Martinson parcel into a tract owned by Ottis S. Arnold. The use of the gravel road, and more specifically the existence of the alleged servitude, is the origin of the dispute between the parties.
>
> All of the above property (collectively the "Arnold property") was previously owned by Sam and Vivian Arnold, who acquired it in 1956. Although unclear when the gravel road was built, Sam and Vivian, along with their tenants, began using the road as early as 1960 to access the Arnold's home. The road was also used by the Worley family, the owners of property on the south side of the road, to access their property.
>
> In the early 1980s, Sam and Vivian began transferring the property to their descendants. They first transferred the Martinson parcel to their daughter, Carol Martinson, on March 25, 1980. The act of sale describes the Martinson parcel, along with the following:
>
>> [A] servitude 0.45 chains in width in an East-West direction connecting the existing Public Road with servitude on property of Ottis Samuel Arnold in favor of Grace Louise Arnold Mapes, Ottis Samuel Arnold and Jerelean Avis Arnold Naramore as per plat and survey of Leey Mapes of record in COB ——, page ——, dated [.]
>
> The referenced Mapes survey is dated March 20, 1979, and shows a servitude that is approximately the same in size and location as shown on the Bodin survey. The act of sale was recorded in the public records shortly after its execution, but the Mapes survey was not.
>
> On April 28, 1982, Sam and Vivian conveyed to Jeffrey and Cynthia Arnold the 1.75 acres ultimately acquired by the Aikmans on August 13, 1993. The 1982 and 1993 conveyances do not mention the disputed servitude. On

2

October 27, 1983, Sam and Vivian transferred the 9.46-acre parcel to Jerelean Naramore. That act of sale does not mention the servitude, but references the Mapes survey. Naramore transferred approximately four acres to her daughter, Tammie Steib, on May 29, 2008. That conveyance contained a survey identifying the gravel road.

The parties used the gravel road without any significant incidents until late 2010 or early 2011, when log trucks and other heavy equipment used the road in connection with timber operations on the Martinson parcel. Baynum objected and blocked further vehicular traffic beyond his driveway by parking a tractor on the road and pulling a large log across it. He later installed and locked a gate at the entrance to the road near West Sam Arnold Loop. Although he gave a key to some members of the Arnold family, confrontations continued. When efforts to amicably resolve the dispute failed, suit was filed on October 20, 2011.

[1] The appendix is an excerpt from a survey prepared by William J. Bodin Jr., dated August 17, 2011, introduced in evidence at trial. The survey presents the properties in a west (left side of page) to east manner.

[2] Naramore's name is incorrectly spelled "Naramone" on the survey.

*Naramore v. Aikman*, 252 So. 3d 935, 937-38 (La. App. 2018).

Prior to their neighbors suing them in state court, the Aikmans filed a claim with Commonwealth concerning the alleged servitude.[9] On April 19, 2011, Ryan S. Galer ("Galer"), Commonwealth's claims counsel, wrote to the Aikmans explaining why Commonwealth denied their claim.[10] Galer writes that the facts of the claim are as follows:

> On August 13, 1993 Jeffrey Travis Arnold and Cynthia Hutcheson Arnold conveyed … the [Property] to [the Aikmans]. [The Aikmans] refinanced the Property on December 20, 2004 and purchased owner's policy of title insurance … underwritten by [Commonwealth]. There is a gravel road (the "Alleged Right-of-Way") across the most southern portion of the Property. [The Aikmans'] neighbors, the Martinson[s], use the Alleged Right-of-Way to access their property. Prior to January 11, 2011, [the Aikmans] posted a sign along the Alleged Right-of-Way that states "do not enter private drive" and informed a relative of [their] neighbors that the Martinson[s] had no business using the Alleged Right-of-Way. … [The Aikmans] contacted the Law Offices of Gary M. Peltier on January 13, 2011 and asked Mr. Peltier whether [their] neighbor has a valid right-of-way across the Property. Mr. Peltier sent [the Aikmans] a letter dated January 18, 2011 advising [them] that … he could not find a recorded right-of-way and encouraged [the Aikmans] to submit a claim with [Commonwealth].

---

[9] R. Doc. 27-2.
[10] *Id.*

3

> [The Aikmans] submitted [their] notice of claim to [Commonwealth] in a letter received by [Commonwealth] on February 3, 2011. [Commonwealth's] claims center opened [the Aikmans'] claim for investigation and administration on February 11, 2011.
>
> [Commonwealth] contacted [the Aikmans] on March 10, 2011 to discuss [their] claim. In that telephone conversation, [the Aikmans] state that the Martinson[s] are claiming a right-of-way across the Alleged Right-of-Way. [The Aikmans] told [Galer] that the Martinson[s] claim that there is a map dating back to 1950 which shows the right-of-way. [The Aikmans] contacted the Tangipahoa Parish courthouse and the Parish engineering department. Neither the courthouse nor the engineering department were able to find a right-of-way benefitting the Martinson[s'] property. [The Aikmans] also stated that the Martinson[s] are claiming a right-of-way across the Property from a right-of-way obtained in 2006. [Commonwealth] ordered a title examination of the Property dating back to 1945. The title search does not show any easements or rights-of-way across the Property except for an easement benefitting the Consolidated Gravity Drainage District #1 of Tangipahoa Parish.[11]

Galer then described the coverage afforded by the policy and explained that the Martinsons' claim to use the right-of-way did not invoke any of the policy's covered risks.[12] Further, Galer explained that the claim fell within several of the policy's exclusions and exceptions from coverage, including an exception in paragraph three (3) of Schedule B for "[e]asements, or claims of easements, not shown by the public records."[13] Galer explained that:

> [Commonwealth's] title search does not show any easement of public record benefitting the Martinson[s'] property. Therefore, even if the Martinson[s] do have an unrecorded valid easement or claim of easement across the Property and one of the Covered Risks were invoked, your claim is excepted from coverage pursuant to paragraph three (3) of the Schedule B Exceptions from Coverage because the Martinson[s'] claim of an easement is not shown in the public records.[14]

Moreover, Galer explained that the Martinsons' claim to the right-of-way allegedly arising from a 2006 document signed by the Tangipahoa Parish Engineer that shows a public gravel road is excluded from coverage because it was created after the policy was issued.[15]

---

[11] *Id.* at 1-2.
[12] *Id.* at 2.
[13] *Id.*
[14] *Id.* at 3.
[15] *Id.*

4

On October 20, 2011, the Aikmans' neighbors sued them in the 21st Judicial District Court, Parish of Tangipahoa, State of Louisiana (the "servitude litigation"), seeking a declaratory judgment establishing the location of the servitude, an injunction prohibiting the Aikmans' from interfering with the use of the servitude, and damages, including attorney's fees and costs. [16] The state-court plaintiffs contend that Sam and Vivian Arnold established the servitude to connect their properties to the public road, and that it has been in continuous use since before Sam and Vivian Arnold began transferring portions of the property to their family members.[17] Specifically, the state-court plaintiffs allege that the October 27, 1983 act of conveyance from Sam and Vivian Arnold to Jerelean Arnold Naramore "provided for a servitude of access to [Naramore's] property," and that the servitude was "referred to in a survey plat provided by Leey Mapes dated March 20, 1979," and recorded in the Tangipahoa Parish public records in the chain of title related to Naramore's property.[18] They also allege that Naramore provided for a servitude of access to the tract of land she donated to her daughter Tammie Naramore Steib ("Steib"), and that it was recorded in the Tangipahoa Parish public records in the chain of title related to Steib's property.[19] Further, the state-court plaintiffs allege that the March 28, 1980 act of conveyance from Sam and Vivian Arnold to Carol Arnold Martinson ("Martinson") "provided for a servitude of access to [Carol Ann Martinson's] property," and that the servitude was "referred to in a survey plat provided by Leey Mapes dated March 20, 1979," and recorded in the Tangipahoa Parish public records in the chain of title related to Martinson's property.[20]

On January 30, 2012, after holding an evidentiary hearing, the state trial court issued a preliminary injunction prohibiting the Aikmans from interfering with the state-court plaintiffs' use of the alleged servitude. *Naramore*, 252 So. 3d at 939. A trial was held in May 2017, at

---

[16] R. Doc. 23-12.
[17] *Id.* at 3.
[18] *Id.* at 2.
[19] *Id.* at 3.
[20] *Id.*

5

which the state trial court heard testimony from "[t]wenty witnesses, including three experts," and received "numerous exhibits, including maps, surveys, and acts of sale reflecting the chain of title for each parcel."[21] *Id.*

> Relying, in part, on Louisiana Civil Code article 741 allowing for the creation of a servitude by "destination of the owner," the [state] trial court found Sam Arnold created a servitude of passage used by the Arnold family to access the property for more than thirty years. In a judgment signed July 17, 2017, the trial court recognized the servitude of passage described in the Bodin survey, permanently enjoined the Aikmans from interfering with its use, and awarded $2,000.00 plus legal interest to Tammie Steib and Craig Steib, $1,000.00 plus legal interest to Jerelean Naramore and LouAnn Naramore, and $2,000.00 plus legal interest to Carol Arnold Martinson, David Martinson, and Julie Martinson. The Aikmans appeal[ed], asserting multiple assignments of error, and plaintiffs answered the appeal, seeking an increase in damages and an award of attorney fees.
>
> ³ The named plaintiffs are Jerelean Arnold Naramore, Tammie Naramore Steib, Craig Steib, LouAnn Naramore, Carol Arnold Martinson, David Henry Martinson, and Julie Faust Martinson.

*Id.*

The state appellate court, which affirmed the trial court, enunciated the Louisiana law of servitudes applicable to the case as follows:

> Apparent servitudes may be acquired by title, destination of the owner, or acquisitive prescription. La. Civ. Code art. 740. Apparent servitudes are those perceivable by exterior signs, works, or constructions; such as a roadway, a window in a common wall, or an aqueduct. La. Civ. Code art. 707. Nonapparent servitudes are those with no exterior sign of their existence, such as the prohibition of building on an estate or of building above a particular height. *Id.* A servitude of passage is the right for the benefit of the dominant estate whereby persons, animals, utilities, or vehicles are permitted to pass through the servient estate. La. Civ. Code art. 705. Unless the title provides otherwise, the extent of the right and the mode of its exercise shall be suitable for the kind of traffic or utility necessary for the reasonable use of the dominant estate. *Id.*
>
> Article 741 defines "destination of the owner" to be "a relationship established between two estates owned by the same owner that would be a predial

---
[21] Seven weeks before the trial, the Aikmans sought leave of court to file a reconventional demand against the state-court plaintiffs and a third-party demand against Commonwealth. *Naramore*, 252 So. 3d at 939. The state trial court denied leave. *Id.*

servitude if the estates belonged to different owners." Article 741 further provides:

> When the two estates cease to belong to the same owner, unless there is express provision to the contrary, *an apparent servitude comes into existence of right* and a nonapparent servitude comes into existence if the owner has previously filed for registry in the conveyance records of the parish in which the immovable is located a formal declaration establishing the destination. [Emphasis added.]

> This article implicitly recognizes that when there is only one owner, there is no servitude, because no one can have a servitude on his own property. *See* Yiannopoulos and Scalise, 4 La. Civ. L. Treatise, *Predial Servitudes* § 6:38 (4th ed. September 2017 Update). But, when the single estate is divided, or two estates cease to belong to the same owner, an apparent servitude comes into existence of right unless the common owner disavows its existence. *See Phipps v. Schupp*, 09-2037 (La. 7/6/10), 45 So.3d 593, 601; Yiannopoulos and Scalise, at § 6:38.

*Naramore*, 252 So. 3d at 940.

Thereafter, the appellate court described the expert and fact witness testimony received by the trial court. *Id.* at 940-43. The fact witnesses testified that the roadway has been used by Sam and Vivian Arnold, their tenants, and decedents to access the property since at least the early 1960s. *Id.* at 941-42. Aikman, on the other hand, testified that his predecessor-in-interest, Jeffrey Arnold, told him that there was no servitude across the property, his act of sale does not mention a servitude, and he was told that his title was clear when he mortgaged the property. *Id.* at 942. According to Aikman, "for the first two years of his ownership, nobody used the road, which he claimed went no further than his driveway." *Id.*

The state appellate court held that the "record reasonably supports the trial court's conclusion the plaintiffs met" their burden of proving "that when Sam and Vivian Arnold owned all the property, a 'relationship' existed between the parcels that would have been a predial servitude if the parcels belonged to different owners; and when Sam and Vivian conveyed the

7

parcels, they did not expressly disavow the servitude." *Id.* at 944 (citations omitted). The appellate court further explained:

> It is undisputed Sam and Vivian Arnold previously owned all of the property presently owned by the Aikmans, Steibs, Martinsons, and Naramore. The record establishes a right of way was cleared and a road was constructed along the disputed strip in the late 1950s or early 1960s to provide access to the property. Since its construction, the road has been apparent and used on a regular basis by the Arnold family and their tenants for access. The construction and use of the road, which is perceivable by exterior signs, works, or constructions, created a relationship between the respective parcels now owned by the Martinsons, Steibs, Aikmans, and Naramore that allowed access to West Sam Arnold Loop. When Sam and Vivian conveyed a portion of the property in 1980 to the Martinsons, an apparent servitude of passage, extending along the visible right of way to West Sam Arnold Loop, was created in favor of the Martinson parcel. *See* La. Civ. Code arts. 707, 740-41; *Huy Tuyet Tran v. Misuraca*, 10-2183, 2011 WL 2617382, p.3 (La. App. 1 Cir. 5/6/11) (holding a servitude of passage was created by destination of the owner when property containing an apparent roadway was divided and sold). The subsequent conveyance of the Aikman parcel in 1982 likewise created a servitude along the same route in favor of the Naramore parcel.

*Naramore*, 252 So. 3d at 943. The state appellate court further noted that the "creation of the servitude [by destination of the owner] was not dependent upon an express declaration in an act of sale, nor did it have to be identified in a survey recorded in the public records." *Id.*

After the state trial court denied the Aikmans' motion for leave to file a third-party demand against Commonwealth (but before the state appellate court rendered its decision), the Aikmans sued Commonwealth in a separate action in the 21st Judicial District Court, Parish of Tangipahoa, State of Louisiana (the "defense-and-indemnity suit"), seeking defense and indemnity for the servitude litigation pursuant to the terms of a title insurance policy, and alleging that Commonwealth was negligent in actions it took in connection with issuing the policy.[22] In the defense-and-indemnity suit, the Aikmans allege that, on January 5, 2005, in connection with a mortgage, Commonwealth issued a title insurance policy to them insuring their

---

[22] R. Doc. 1-3.

immovable property that was at issue in the servitude litigation.[23] The Aikman's allege that the Commonwealth policy provided coverage for the servitude litigation in which the state-court plaintiffs had, at that time, alleged (but not yet established) that they had a previously recorded servitude over the Aikmans' property.[24] In the defense-and-indemnity suit, the Aikmans further allege that Commonwealth breached the contract and was negligent by: failing to conduct a proper title search of their property; failing to timely notify the Aikmans in writing of the recordation of the liens, servitudes, and right-of-passage over their property; failing to advise the Aikmans of the right under the law to clear the title to their property; and failing to provide an attorney to defend them in the servitude litigation.[25]

On May 20, 2017, Commonwealth removed the defense-and-indemnity suit to this Court asserting diversity subject-matter jurisdiction under 28 U.S.C. § 1332.[26] On June 8, 2018, after the Louisiana appellate court issued its opinion in the servitude litigation, a scheduling order was entered in this case.[27]

## II. PENDING MOTIONS

Commonwealth filed a motion for summary judgment arguing that the Aikmans' claims related to the servitude are clearly excluded by several policy provisions.[28] The Aikmans filed a cross-motion for summary judgment in which they argue that Commonwealth breached the contract by failing to provide them with defense and indemnity because they claim that the servitude was discoverable in the Tangipahoa Parish public records.[29] To support their argument, the Aikmans rely on opinions rendered by Julian J. Rodrigue, Jr. ("Rodrigue"), a

---

[23] *Id.* at 2.
[24] *Id.* at 3.
[25] *Id.* at 3-4.
[26] R. Doc. 1 at 2.
[27] R. Doc. 15.
[28] R. Doc. 23.
[29] R. Doc. 36.

purported expert in Louisiana real property law.³⁰ Commonwealth moved to exclude Rodrigue's opinions, and those of Ashton W. Ray ("Ray"), the Aikmans' purported land valuation expert, because the Aikmans failed to timely provide expert reports to Commonwealth in accordance with the Federal Rules of Civil Procedure and the scheduling order.³¹

## III. LAW & ANALYSIS

### A. Commonwealth's Motion to Exclude

Commonwealth argues that this Court should exclude the testimony of the Aikmans' purported experts Rodrigue and Ray because the Aikmans failed to timely produce expert reports.³² According to this Court's scheduling order, the Aikmans' deadline for providing to Commonwealth written expert reports, as defined by Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, was October 12, 2018.³³ The Aikmans provided Ray's expert report to Commonwealth on November 13, 2018, and did not provide any report for Rodrigue.³⁴ Instead, on November 8, 2018, the Aikmans produced an affidavit executed by Rodrigue as an exhibit to their opposition to Commonwealth's motion for summary judgment.³⁵

Rule 26(a)(2)(B) provides that expert witnesses who are "retained or specially employed to provide expert testimony in the case" must submit expert reports that contain specified information. Fed. R. Civ. P. 26(a)(2)(B). Pursuant to Rule 26(a)(2)(D), a party must produce expert reports "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). The "basic purpose" of Rule 26 is "preventing prejudice and surprise." *Reed v. Iowa Marine & Repair Corp.*, 16 F.3d 82, 85 (5th Cir. 1994).

---

³⁰ *Id.*
³¹ R. Doc. 38.
³² *Id.*
³³ R. Doc. 15 at 1-2.
³⁴ R. Doc. 38 at 1.
³⁵ *Id.* at 1-2.

Rule 37(c)(1) of the Federal Rules of Civil Procedure states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) …, the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Further, this Court's scheduling order states that the "Court will not permit any witness, expert or fact, to testify or any exhibits to be used unless there has been compliance with this Order as it pertains to the witness and/or exhibits, without an order to do so issued on motion for good cause shown." In determining whether a violation of Rule 26 is harmless or substantially justified, courts consider: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Tex. A&M Research Found. v. Magna Transp., Inc.,* 338 F.3d 394, 402 (5th Cir. 2003).

The Aikmans argue that the expert testimony is important because cases involving servitudes are complicated and Commonwealth will rely on some expert testimony.[36] They argue that any prejudice to Commonwealth can be cured by continuing the trial.[37]

The Court finds a balancing of the factors weighs in favor of excluding the testimony of Ray and Rodrigue. The Aikmans have offered no explanation as to why they failed to timely comply with the scheduling order, which has been in place since June 8, 2018. Further, the Aikmans have not shown how the proffered expert testimony is essential considering that the pertinent facts and state law were examined and clearly recounted by the state appellate court in the servitude litigation, and this Court is familiar with the Louisiana contract law applicable to the issues in this case. The Fifth Circuit has stated that the alleged "importance of such proposed testimony cannot singularly override the enforcement of local rules and scheduling orders," and

---

[36] R. Doc. 42 at 8-11.
[37] *Id.* at 11.

that "a continuance would not deter future dilatory behavior, nor serve to enforce local rules or court imposed scheduling orders." *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir. 1990). Moreover, a continuance of this trial would not cure any prejudice to Commonwealth because discovery is closed and this matter is ripe for decision on the cross-motions for summary judgment. As such, Commonwealth's motion to exclude the testimony of Ray and Rodrigue is GRANTED, and this Court will not consider Rodrigue's affidavit in ruling on the cross-motions for summary judgment.

**B. Cross-Motions for Summary Judgment**

**1. Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed

when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P.

56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### 2. Contract Interpretation

Under Louisiana law, an insurance policy, like any other contract, is construed according to the general rules of contract interpretation set forth in the Louisiana Civil Code. *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003) (citations omitted). Contracts are interpreted to determine "the common intent of the parties." *Id.* (citations omitted). "Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Id.* (citations omitted). An insurance policy "should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion." *Id.* (citations omitted). A court cannot exercise "inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent." *Id.* (citations omitted). Thus, clear and unambiguous policy wording that expresses the parties' intent is enforced as written. *Id.*

Ambiguous provisions and "equivocal provisions seeking to narrow an insurer's obligation," on the other hand, are strictly construed against the insurer and in favor of coverage. *Id.* (citations omitted). However, the strict construction principle applies only if the ambiguous policy provision is susceptible to more than one reasonable interpretation. *Id.* (citations omitted). "[T]he insurer has the burden of proving the applicability of a coverage exclusion." *Hampton v. Lincoln Nat'l Life Ins. Co.*, 445 So. 2d 110, 113 (La. App. 1984). "The determination of whether a contract is clear or ambiguous is a question of law." *Cadwallader*, 848 So. 2d at 580.

### 3. Duty to Defend

An insurer's duties of defense and indemnity are separate and distinct obligations. *Martco Ltd. P'ship v. Wellons, Inc.,* 588 F.3d 864, 872 (5th Cir. 2009) (citing *Elliott v. Cont'l Cas. Co.,* 949 So. 2d 1247, 1250 (La. 2007)). An "insurer's duty to defend suits brought against its insured is determined by the allegations of the injured plaintiff's petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage." *Meloy v. Conoco, Inc.*, 504 So. 2d 833, 838 (La. 1987). Thus, in evaluating an insurer's duty to defend, a court examines only "'the plaintiff's pleadings and the face of the policy, without consideration of extraneous evidence.'" *La. Stadium & Exposition Dist. v. BFS Diversified Prod., LLC,* 49 So. 3d 49, 51 (La. App. 2010) (quoting *Bryant v. Motwani*, 683 So. 2d 880, 884 (La. App. 1996)). By way of contrast, in examining the duty to indemnify, a court "must apply the Policy to the actual evidence adduced at the underlying liability trial together with any evidence introduced in the coverage case." *Martco*, 588 F.3d at 877.

### C. The Commonwealth Policy

On January 5, 2005, Commonwealth issued a title insurance policy to the Aikmans covering the property at issue in the servitude litigation.[38] Subject to certain exclusions and exceptions, the policy that provides up to $75,000 in coverage against loss or damage sustained or incurred by the Aikmans by reason of:

1. Title to the estate or interest described in Schedule A being vested in other than [the Aikmans];

2. Any defect in or lien or encumbrance on the title;

3. Unmarketability of the title;[39]

---

[38] R. Doc. 23-14 at 2.
[39] "[U]nmarketability of the title" is defined as "an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title." *Id.* at 6.

  4.  Lack of a right of access to and from the land.[40]

The policy also provides that Commonwealth will "pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured, but only to the extent provided in the Conditions and Stipulations."[41] Section 4 of the "Conditions and Stipulations" provides that Commonwealth's duty to defend applies to "litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. … [Commonwealth] will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy."[42]

  Schedule B of the policy states:

> This policy does not insure against loss or damage (and [Commonwealth] will not pay costs, attorneys' fees or expenses) which arise by reason of:
>
> 1.  Rights or claims of parties other than Insured in actual possession of any or all of the property.
>
> 2.  Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of the premises.
>
> 3.  Easements, or claims of easements, not shown by the public records.[43]

Further, the policy excludes from coverage, and Commonwealth "will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of: … [d]efects, liens, encumbrances, adverse claims or other matters … attaching or created subsequent to Date of Policy …."[44]

  All of the Aikmans' claims against Commonwealth in the case at bar stem from Commonwealth's alleged breaching of the insurance contract (the title policy) by failing to

---

[40] *Id.* at 5.
[41] *Id.*
[42] *Id.* at 6.
[43] *Id.* at 3. The policy defines "public records" as "records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge." *Id.* at 6.
[44] *Id.* at 5.

16

defend and indemnify the Aikmans in the servitude litigation. The Aikmans essentially assert that, after they made their claim to Commonwealth in February 2011, Commonwealth did not properly conduct the title search of their property which led Commonwealth (1) to deny coverage based on paragraph 3 in Schedule B's exceptions from coverage, and (2) to not timely notify the Aikmans in writing of the recordation of the servitude over their property, and (3) to not advise the Aikmans of their right under the law to clear the title to their property.

Commonwealth based its denial of the Aikmans' claim, in part, on the exception from coverage of "easements, or claims of easements, not shown by the public records."[45] This "exception is intended to insulate title insurers from losses resulting from easements that were created as a matter of law and by prescription or implication and that cannot be discovered" "from a standard search of the public real property records." 1 JOYCE PALOMAR, TITLE INSURANCE LAW § 7:12 (2017). The exception applies to easements that are contained in "instruments that cannot be connected to the chain of title." *Id.* "The common law word 'easement' has been uniformly accepted in Louisiana law to convey the same idea expressed by the Louisiana word 'servitude.'" *Ibert v. Croulet*, 2018 WL 5816687, at *1 n.2 (La. App. Nov. 7, 2018) (citing *Humble Pipe Line Co. v. Wm. T. Burton Indus., Inc.*, 217 So. 2d 188 (1968); *Quibodeaux v. Andrus*, 886 So. 2d 1258 (La. App. 2004)).

The state trial court found, and the state appellate court affirmed, that the servitude at issue in this case was created by destination of the owner under Louisiana Civil Code article 741. *Naramore*, 252 So. 3d at 943-44. In so holding, the state appellate court noted that "[t]he Aikmans' reliance on the public records doctrine is misplaced. The creation of the servitude was not dependent upon an express declaration in an act of sale, nor did it have to be identified in a survey recorded in the public records." *Id.* at 943. The allegations in the state-court petition in

---

[45] Because the Court finds that Commonwealth correctly relied on the exception for easements not shown in the public records in denying coverage, there is no need to discuss the other exclusions or exceptions to coverage that might apply.

17

the servitude litigation recited the facts of Sam and Vivian Arnolds' transfers of the parcels that resulted in the creation of the servitude as a matter of law by destination of the owner.[46] Further, it is undisputed that the servitude does not appear in the chain of title to the Aikmans' property. *Naramore*, 252 So. 3d at 938. As such, it would not be revealed by a standard search of the chain of title for that particular property. Therefore, Commonwealth did not breach the contract by not providing defense and indemnity to the Aikmans in the servitude litigation because the allegations of the petition in that case reveal on their face that the "easement" exception would apply to exclude coverage so that Commonwealth's duty to defend was not triggered.[47]

## IV. CONCLUSION

IT IS ORDERED that Commonwealth's motion to exclude testimony from Ashton W. Ray and Julian J. Rodrigue, Jr. (R. Doc. 38) is GRANTED.

IT IS FURTHER ORDERED that the Aikmans' motion for summary judgment (R. Doc. 36) is DENIED.

IT IS FURTHER ORDERED that Commonwealth's motion for summary judgment (R. Doc. 23) is GRANTED, and the Aikmans' lawsuit is DISMISSED WITH PREJUDICE.

---

[46] R. Doc. 23-12.
[47] Further, because the servitude was not in the public records related to the Aikmans' property, Commonwealth did not breach the contract by failing to timely notify the Aikmans in writing of the recordation of any servitude over their property or failing to advise the Aikmans of their right under the law to clear the title to their property. Moreover, there is no evidence that Commonwealth was negligent in performing the title search, and, in any event, the law does not support the notion that an insured may bring a negligence claim against its title insurer where the obligation to the insured lies in contract, not tort. Because the Court's ruling on the "easement" exception constitutes a sufficient ground for granting summary judgment to Commonwealth, the Court does not address Commonwealth's remaining arguments that the Aikmans' claim arising from servitude litigation are not covered by the title policy.

18

New Orleans, Louisiana, this 21st day of December, 2018.

                                              _____
                                              BARRY W. ASHE
                                              UNITED STATES DISTRICT JUDGE